# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————————— x
: 
: 
SUFYIAN BARHOUMI,                          :
: 
                       Petitioner,              :
: 
               v.                           :     Civil Action No. 05-cv-1506 (RMC)
: 
BARACK OBAMA, *et al.*,                     :
: 
                     Respondents.           :
: 
: 
—————————————————————— x
—————————————————————— x
: 
: 
: 
ABDULLATIF NASSER,                          :
: 
                       Petitioner,              :
:     Civil Action No. 05-764 (CKK)
               v.                           :
: 
BARACK OBAMA, *et al.*,                     :
: 
                     Respondents.           ::
: 
: 
—————————————————————— x

## EMERGENCY MOTION FOR ORDER EFFECTING RELEASE

Shayana D. Kadidal (D.D.C. Bar No. 454248)
Omar Farah (pursuant to LCvR 83.2(g))
J. Wells Dixon (pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor

New York, New York 10012
(212) 614-6438
kadidal@ccrjustice.org
ofarah@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Petitioner Barhoumi*

Thomas Anthony Durkin
DURKIN & ROBERTS
2446 N. Clark St.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com

*Attorney for Petitioner Nasser*

Petitioners Sufyian Barhoumi (ISN 694) and Abdullatif Nasser (ISN 244) respectfully move for emergency orders effecting their release. The motion should be granted pursuant to 28 U.S.C. §§ 2241 and 2243, and the Court's equitable habeas powers, because Petitioners' detention is arbitrary and violates U.S. and international law.

Counsel for the government has been consulted and opposes this motion in each case. Petitioners respectfully request that the government be ordered to respond to this motion by noon on Wednesday, January 18.

## <u>Preliminary Statement</u>

Petitioner Barhoumi, a native and citizen of Algeria, has been detained without charge at the U.S. Naval Station at Guantánamo Bay, Cuba, for more than fourteen years. More than a decade ago he filed his habeas corpus case challenging the legality of his initial capture and detention. The petition was denied in September 2009, and affirmed on appeal in June 2010. Almost six years later, in May 2016, Petitioner appeared before a Periodic Review Board, which concluded his detention is no longer necessary, and for that reason stated that it would exercise its discretion to release him.  Since then the government has sought to transfer him to Algeria, a stable country to which fifteen other former Guantánamo detainees have been returned without incident. Petitioner is the last cleared Algerian remaining at Guantánamo. He strongly desires to return there and be reunited with his family.

Petitioner Nasir finds himself in almost identical circumstances. Nasir is a native and citizen of Morocco, and has also been detained without charge in Guantánamo for fourteen years. Nasir has been similarly unsuccessful in obtaining relief from a habeas corpus petition.

Notwithstanding Petitioners' desire to return to their home countries, and the government's efforts to send them there, counsel understand that their transfers have been

delayed due to bureaucratic obstacles unrelated to Petitioners, the underlying facts of their cases, or any serious substantive concerns about the ability of their home countries to receive and monitor them. As a consequence, counsel are informed and believe that Petitioners Barhoumi and Nasser have not yet been certified by the Defense Secretary for transfer to their home countries of Algeria and Morocco, respectively, and notice of their transfers has not yet been provided to Congress, as currently required by the National Defense Authorization Act prior to any transfer from Guantánamo that is not ordered by a court. Under existing law, the Secretary of Defense must in such cases certify that transfers are in the national security interest, that the receiving country has agreed to take "appropriate steps to substantially mitigate any risk" of engaging in terrorism or threatening the U.S., its allies or its interests and "has agreed to share with the United States any information that is related to the individual," and must assess the receiving country's past and anticipated future compliance. National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1034(b), 129 Stat. 726, 969 (Nov. 25, 2015). Notice of this certification "to the appropriate committees of Congress" must occur 30 days prior to actual transfer. However, there is one codified exception to the certification and waiting period requirements: they do not apply to transfers made "to effectuate an order affecting disposition of the individual by a court...." *Id*. § 1034(a)(2).

In Petitioners' cases, therefore, without court orders effectuating their releases, even if the government concludes the paperwork necessary to repatriate them, the 30-day notice period will not conclude and Petitioners will not be sent home before the end of the current administration on January 20, 2017. Indeed, absent a court order they may never be released. This is so because the President-Elect has stated publicly his intent not to release any detainees from Guantánamo regardless of the facts or circumstances of their cases. If Petitioners are not

transferred within the next week by the outgoing administration, they will likely not be transferred from Guantánamo for at least the next four years. Accordingly, they seek an emergency order setting aside the certification and 30-day advance notice requirements, or, alternatively, granting the writ, which would allow the current administration to release them immediately.

The Court should grant relief as follows. First, the Court should enter an order, plainly authorized by the plain language of the NDAA, declaring that the certification and 30-day notice requirements not apply in the unique context of these cases. An order granting this relief would as a practical matter remove the only remaining obstacle to Petitioners' transfers. There is also no serious dispute that this court has habeas jurisdiction to grant relief. Habeas corpus is an equitable writ, and the mandate of a court confronted with a claim of unlawful imprisonment is to exercise its independent judicial judgment as to what justice requires under the totality of circumstances and to fashion appropriate relief, including declaratory relief or other interim relief. Moreover, as the length of Petitioners' non-criminal detention drags on without foreseeable end—for reasons unrelated to any ostensible need for continued detention, as their Periodic Review Boards have determined—the scope of this Court's equitable habeas review must adapt to the changed circumstances and the corresponding, increased risk of an erroneous and capricious deprivation of their liberty. A habeas court has broad equitable authority to dispose of this case as justice and law require.

Second, in the alternative, the Court should grant the writ of habeas corpus because Petitioners' detention violates the AUMF and Due Process Clause. Petitioners' continuing detention is not authorized by the Authorization for Military Force ("AUMF"), Pub. L. 107-40, § 2(a), 115 Stat. 224, 224 (2001). Even if Petitioners were once part of the Taliban, Al Qaeda or

associated forces more than a decade ago, the AUMF's authorization of only "necessary and appropriate" force limits the duration of their detention and requires release without further delay. Under these unique circumstances, the AUMF does not permit indefinite, potentially life-long detention simply because purely administrative obstacles impede efforts to implement a transfer that all parties urgently seek to conclude. Applying ordinary canons of statutory construction, the AUMF must be read narrowly to avoid a contrary interpretation that would raise serious constitutional concerns.

Moreover, the Due Process Clause of the Constitution applies at Guantánamo and limits the duration of Petitioners' detention under these unique circumstances. The Supreme Court has concluded that due process and habeas corpus are inextricably intertwined, and imposition of due process limits on Petitioners' indefinite detention without foreseeable end is not otherwise impractical or anomalous.

Accordingly, this motion[1] should be granted. Two forms of proposed orders are attached.

## Background

### Sufyian Barhoumi

Sufyian Barhoumi is a 44-year-old Algerian citizen born and raised in Algiers, where his mother still lives and his late father practiced law. He has been held at Guantánamo since June 2002. Throughout the years of his detention he has never expressed any concerns or reservations

---

[1]    The government has occasionally objected in word to presentation of claims such as these without the filing of a new habeas petition, *see* Resp'ts' Opp'n to Pet'r's Mot. to Reinstate Habeas Pet'n and for Judgment on the Record at 2 n.1, *Ba Odah v. Obama*, No. 06-CV-1668 (TFH) (D.D.C. filed in redacted form Aug. 24, 2015) (dkt. no. 283-1), but in every instance we are aware of, the government has nonetheless litigated the merits of the motion. In any event, the question is irrelevant here, since it is within the equitable power of any federal court to construe any pleading as a petition for habeas corpus. *See* Fed. R. Civ. Proc 8(e) ("Pleadings must be construed so as to do justice."); *see also* PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 77-83 (2010) (various prerogative writs united by sweeping conception to ensure King's justice was done to prisoner); *Schlup v. Delo*, 513 U.S. 298, 317-21 (1995).

about being returned to Algeria. He was cleared for release by the unanimous[2] decision of a Periodic Review Board which heard his case on May 26, 2016, questioning him directly in great detail. He strongly desires to be reunited with his mother and several brothers living in Algiers, who have promised to house and support him financially.

In announcing its consensus decision "that continued law of war detention of [Barhoumi] is no longer necessary to protect against a continuing significant threat to the security of the United States," the Board noted his "candor," "acknowledgment and acceptance of responsibility for past activities," and "his lack of extremist views." It also noted his "detailed plan for the future and extensive family and outside support,"[3] his exceptional "record of compliance… and history of positive engagement with the guard force,"[4] and efforts at self-improvement during his detention. The Board concluded by "recommend[ing] repatriation to Algeria due to the detainee's strong family support and Algeria's strong track record in prior transfers."

### Abdullatif Nasir

Abdullatif Nasir is a 51-year-old Moroccan citizen, born in Casablanca, Morocco, where his large extended family still resides. He has been held at Guantánamo for 14 years, since May 2, 2002. On July 11, 2016, he was cleared for release by the unanimous decision[5] of a Periodic

---

[2]     The Periodic Review Board consists of a chairperson from the Department of Defense and representatives of the six agencies—the Departments of Defense, Homeland Security, Justice, and State; the Joint Staff, and the Office of the Director of National Intelligence. A decision by the Board to clear a detainee for transfer requires the unanimous consensus of all six agency representatives.

[3]     His family purchased a small restaurant for him to operate and a new Volkswagen in anticipation of his imminent return home.

[4]     Barhoumi was the first detainee to have a letter in support of his release written by a former guard submitted in connection with his Periodic Review Board hearing.

[5]     *See* note 2, *supra*.

Review Board, after a comprehensive presentation which included direct questioning of Mr. Nasir. He wishes desperately to be reunited with his family members in Morocco, ten of whom submitted individual statements to the Periodic Review Board.

In announcing the decision "that continued law of war detention of [Nasir] is no longer necessary to protect against a continuing significant threat to the security of the United States," the Board noted his "candid responses" to questioning; "multiple avenues for support upon transfer, to including a well-established family with a willingness and ability to provide him with housing, realistic employment opportunities, and economic support;" his "renunciation of violence;" "low number of disciplinary infractions while in detention;" educational efforts at Guantánamo through "classes and self-study;" and, his lack of contact with individuals involved in terrorism related activities outside of Guantánamo.[6] The Board concluded by recommending transfer to Morocco.

## Argument

The Court is confronted with a situation unique to the particular facts and circumstances of these cases: Petitioners remain in detention, and, absent a judicial order, will likely remain detained in another four years (at minimum) for reasons unrelated to any ostensible government necessity or desire to continue to detain them. The question to be decided by the Court is not *whether* Petitioners should be released from Guantánamo, or *where* they should be sent, but whether the result sought by all parties—repatriation—may lawfully be delayed for a period of years because of administrative delays in filing paperwork. The government has exercised its discretion to release Petitioners and made what all parties expected to be routine efforts to

---

[6]     *See* Unclassified Summary of Final Determination, ISN 244, July 11, 2016, *available at* http://www.prs.mil/Portals/60/Documents/ISN244/20160711_U_ISN244_FINAL_DETERMIN ATION_PUBLIC.pdf.

transfer them. According to news reports, however, paperwork for their transfers was delayed for unexplained bureaucratic reasons. It is unclear whether or when those issues may be resolved. Yet the delay means that Petitioners cannot leave Guantánamo until after a new administration— which has vowed to transfer no one, regardless of circumstances—is in power. Under these circumstances, Petitioners' detention would be indefinite, arbitrary and perpetual by any measure, and would likely remain so absent a court order.

To be clear, Petitioners do not in this motion challenge the basis for their initial capture and detention. And Petitioners do not ask the Court to direct their transfer to a preferred country of their choosing. They simply seek an order that will effectuate the result desired by all parties—repatriation—either by eliminating any legislative or bureaucratic obstacles to their transfer, or, alternatively, by granting the writ. The Court should exercise its equitable habeas authority and enter an order effectuating their release without delay.

**I.      The NDAA Permits Transfer after an Order Falling Short of Issuance of the Writ**

Petitioners continue to be held in part due to Congress's enactment of detainee transfer restrictions, most recently codified in section 1034 of the National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, 129 Stat. 726, § 1031 (Nov. 25, 2015) ("NDAA").[7] Like the transfer restrictions included in earlier legislation, the current restrictions prevent the government from using funds allocated by Congress to transfer detainees to foreign countries unless the Secretary of Defense issues a multi-part certification attesting to certain factors such as the transferee country's capacity to accept the detainee, and complies with certain onerous reporting requirements. *Id.* § 1034(a)(1), (b)-(e). The only exception to the certification and reporting requirements is in instances where the detainee obtains an order "affecting the

---

[7]      These provisions are unmodified by the NDAA for Fiscal Year 2017, Pub. L. 114-328, §§ 1031-35, signed into law on December 23, 2016.

disposition of the individual [to be transferred] that is issued by a court or competent tribunal of the United States having lawful jurisdiction." *Id.* § 1034(a)(2).

As an alternative to granting their habeas petitions, the Court should enter an order declaring that Petitioners fall within the court-order exception to the current transfer restrictions. An order granting this relief would, as a practical matter, remove the only remaining obstacle to their release. This Court should construe the exception in NDAA § 1034(a)(2) to apply to the unique facts and circumstances of these cases. Congress has created a specific statutory exception to the certification requirement for instances in which courts or tribunals with jurisdiction enter orders "affecting the disposition" of detainees. That statutory exception should be construed to extend broadly, beyond orders that grant the writ and mandate efforts towards release, for two reasons.

First, the statutory exception should be read broadly based on its plain language. Tracking closely a habeas court's authority under 28 U.S.C. § 2243 to "dispose of [a] matter as law and justice require," the language of the NDAA court-order exception plainly contemplates court orders that fall short of granting habeas petitions. The statute does not reference habeas petitions. It applies broadly to orders "affecting the disposition" of a detainee, which surely include but are not limited to habeas grants.[8] Indeed, nothing about that language indicates that it is limited to orders resolving cases on their merits, or that that was Congress's intention in drafting the exception. If Congress had intended to limit such orders to habeas grants, it undoubtedly would have done so in clear terms. *Cf. Boumediene v. Bush*, 553 U.S. 723, 792

---

[8]     As further indication that the statute applies to more than habeas grants, the exception references not only orders issued by a "court," but also orders issued by a "competent tribunal." What is meant by "competent tribunal" is unclear; nothing in the relevant text or legislative history indicates this language was limited to any particular type of judicial, military or administrative proceeding. In any event, the reference to tribunals in addition to courts confirms that the exception applies to more than court orders granting release in habeas.

(2008) (invalidating Congress's specific attempt to strip courts of jurisdiction to hear detainee habeas cases); Detainee Treatment Act of 2005, Pub. L. No. 109–148, § 1005(e), 119 Stat. 2680, 2741-42 (attempting to strip habeas jurisdiction); Military Commission Act of 2006, Pub. L. No. 109-366, § 7(a), 120 Stat. 2600, 2635-36 (same). There is likewise nothing in the legislative history of the NDAA to indicate that Congress intended to limit the court-order release exception to habeas *grants*.[9] Rather, the court order release exception was first added to the 2011 NDAA during conference, apparently without debate, and the legislative history of the 2012 NDAA clarified that notwithstanding the imposition of the certification requirement detainee transfers from Guantánamo were expected to continue under the NDAA. *See H. Comm. on Armed Serv., 111th Cong., Legis. Text & J. Explanatory Statement to Accompany H.R. 6523*, at 472 (Comm. Print 2010); 157 *Cong. Rec.* S7641 (daily ed. Nov. 17, 2011) (statement of Sen. Carl Levin) ("Contrary to what some have said, [the 2012 NDAA transfer restrictions] do[ ] not prohibit transfers from Gitmo. In fact, [the 2012 NDAA] is less restrictive of such transfers than legislation passed in the last Congress and signed by the President."). Later versions of the NDAA simply extended the restrictions, occasionally with some adjustments or modifications.

One notable modification over the years, however, was the removal of a notice-to-Congress and 30-day waiting period requirement for transfers pursuant to court order. An earlier version of the restrictions mandated that Congress receive 30 days advance notice of transfers, with no exception for situations where the transfer was made to effectuate the order of a court. *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113-66, 1035(d), 127 Stat.

---

[9]     Arguments about Congress's intentions are irrelevant as a matter of law given the plain language of the statute, *see United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989), but it would be entirely reasonable to conclude that Congress drafted the exception to allow for flexibility in circumstances where a court (rather than the Executive) concludes it is necessary to declare the transfer restrictions inapplicable to a particular detainee. *See* 28 U.S.C. § 2243.

672, 853 (Dec. 26, 2013) (requiring notification "not later than 30 days before the transfer or release," even for transfers authorized by 1035(a)(2), authorizing transfers "to effectuate an order affecting disposition of the individual by a court or competent tribunal of the united States having jurisdiction."). The current version of the restrictions in the 2016 NDAA's section 1034(a)(2), entitled "Reenactment *and Modification of* Certain Prior Requirements for Certifications Relating to Transfer of Detainees at United States Naval Station, Guantanamo Bay, Cuba, to Foreign Countries and Other Foreign Entities" (emphasis added), pointedly exempts transfers to effectuate a court order from the § 1034(a)(1) requirement of advance notice to Congress. The removal of this notification requirement for transfers under the court order exception, while the rest of the language codifying the court order exception remained unchanged, is the strongest possible evidence that Congress understood that transfers to effectuate a court order would take place without advance notice.

Second, the statutory exception should be read broadly to avoid serious constitutional problems that would otherwise arise if the NDAA were actually to block Petitioners' transfers under the unique facts and circumstances of their present situations. *See Zadvydas v. Davis*, 533 U.S. 678, 689-90 (2001) (implying reasonable limitation on statute to avoid serious constitutional concerns); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (same); *see also* Statement by the President on S. 1356 (Nov. 25, 2015) (noting NDAA restricts detainee transfers, could interfere with ability to transfer detainees who have obtained writs of habeas corpus, and may violate separation of powers), *available at* https://www.whitehouse.gov/the-press-office/2015/11/25/statement-president.

If there were any doubt about the sufficiency of the plain language of NDAA § 1034(a)(2) as a basis for the Court to enter an order triggering the exception and thereby avoid

the transfer restrictions without granting Petitioners' habeas petitions, the Court should construe the court-order provision in light of its equitable habeas authority in order to provide the practical relief that Petitioner requests. *See* 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."); *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (equitable habeas power used to fill statutory gaps); *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the clearest command.") (internal quotation marks omitted). Indeed, the law is clear that courts have habeas authority to enter any form of order, including declaratory relief, where, as here, the requested relief directly compels or indirectly "affects" or hastens the petitioner's release from custody. *See Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973) (noting that habeas courts have the "power to fashion appropriate relief other than immediate release."); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) (emphasizing that habeas statute "does not limit the relief that may be granted to discharge of the applicant from physical custody. Its mandate is broad with respect to the relief that may be granted."); *see also*, *e.g.*, *Edwards v. Balisok*, 520 U.S. 641 (1997) (after determining that true nature of relief sought is speedier release from imprisonment, Court assumes that habeas court had authority to adjudicate claim); *Brownell v. Tom We Shung*, 352 U.S. 180, 181 (1956) (non-citizen may test legality of inadmissibility determination in declaratory judgment action or through habeas corpus); *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 809 (D.C. Cir. 1988) (holding that habeas is available for petitioner challenging parole eligibility even though he is "not laying claim to immediate release or release in the near future"); *Bourke v. Hawk-Sawyer*, 269 F.3d 1072, 1074 (D.C. Cir. 2001) (holding that habeas is appropriate remedy for petitioner seeking to challenge his eligibility for a sentence reduction); *cf. Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 665

(D.C. Cir. 2013) (suggesting that habeas may not be available for claims that have only a "probabilistic" impact on custody).

Since the 17th Century, courts in England and America with authority to dispose of habeas corpus petitions have been governed by equitable principles. *See Sanders v. United States*, 373 U.S. 1, 17 (1963); *Boumediene v. Bush*, 553 U.S. 723, 780 (2008) (citing *Schlup v. Delo*, 513 U.S. 298, 319 (1995)). "Indeed, common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." *Boumediene*, 553 U.S. at 779; *Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (habeas is not a "static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose"). In exercising habeas jurisdiction, courts have equitable discretion to correct a miscarriage of justice. *See McClesky v. Zant*, 499 U.S. 467, 502 (1991). Habeas courts also have not hesitated to fill perceived gaps in a statutory scheme, place a central focus on justice rather than law, and impose flexible, pragmatic remedies. *See Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993); *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the clearest command.") (internal quotation marks omitted); Brief of Eleven Legal Historians as *Amici Curiae* Supporting Petitioner, *Holland v. Florida*, 130 S. Ct. 2549 (No. 09-5327) (citing cases); *see also Boumediene*, 553 U.S. at 780 (common-law habeas courts often did not follow black-letter rules in order to afford greater protection in cases of non-criminal detention). "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). *See generally* PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 87 (2010) ("Ensuring that errors were corrected and 'justice should be done' ... even where law had not previously provided the means

12

to do so, was the point of the prerogative writs. ... There was and is another word for this vast authority to do justice, even in the absence of previously existing rules or remedies: equity."); *id.* at 89-90 (at common law, equity was conceived of as an idea "associated with the provision of mercy, attention to the specific facts of every case, and the imperative that all judgments fulfill the laws of God and nature. Pursuing such ideas in practice was to open 'the hidden righteousness' of the grounds of law."); *id.* at 102 ("The key to making judgments about infinitely variable circumstances was the consideration of details about why, when, how and by whom people were imprisoned.").

Here, again, there can be no serious dispute that an order declaring that Petitioners fall within the NDAA exception would hasten their release. A flexible, pragmatic remedy is acutely and unquestionably necessary in this exceptional case in order to cut right to the heart of this matter, end Petitioners' indefinite detention, and correct a miscarriage of justice. *See generally* HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 101 (common law habeas judgments "did not just happen; they were made. Judges, not rules, made them.... By negotiating settlements, by constraining—sometimes undermining—the statutes or customs on which other magistrates acted, and by chastising those who wrongfully detained others, the justices defined what counted as jurisdiction and what counted as liberties."); *see also* THE FEDERALIST NO. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The practice of arbitrary imprisonment[ ] [has] been, in all ages, [among] the favorite and most formidable instruments of tyranny."); *Boumediene*, 553 U.S. at 744 (quoting this passage). The Court should therefore enter an order declaring, based on the unique facts and circumstances of this case, that Petitioners fall within the statutory exception set forth in NDAA § 1034(a)(2), and are not subject to the certification and reporting requirements of NDAA § 1034(a)(1), (b)-(e). (*See* Proposed Order #1,

attached.) Such an order is minimally necessary to sweep aside a substantial, practical obstacle to Petitioners' transfer and correct a miscarriage of justice.[10]

## II.      Petitioners' Arbitrary Detention Violates the AUMF.

In the alternative to entering an order declaring the certification and 30 day notice requirements inapplicable, this Court should grant the writ on the ground that Petitioners' detention is unlawful because it is arbitrary, indefinite, and perpetual by any reasonable measure. (*See* Proposed Order #2, attached.) Their detention therefore violates the AUMF's qualified force authorization and the Supreme Court's holding in *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004), that indefinite or perpetual detention for no purpose is unlawful. Indeed, under the laws of war that the government concedes limit its AUMF detention authority, a detainee must be released where detention is no longer necessary to prevent return to the battlefield. The Court should also construe the AUMF not to authorize Petitioners' detention under these circumstances in order to avoid serious constitutional issues that would arise from a statute sanctioning non-criminal detention that no longer serves any ostensible purpose.

### A.      Petitioners Must Be Released Under the AUMF Because
### Their Detention Is No Longer Necessary or Appropriate.

The government has claimed authority to detain Petitioners pursuant to the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, § 2(a), 115 Stat. 224, 224 (2001), which permits the use of "necessary and appropriate force [against a narrow set of groups or individuals] in order to prevent any future acts of international terrorism against the United States." But the AUMF "does not authorize unlimited, unreviewable detention." *Basardh v.*

---

[10]      To be clear, such an order need not be an order of *release*. Although Petitioner seeks in the alternative an order granting his habeas petition, *see infra* Part II, he does not seek that relief pursuant to the NDAA. He requests an order declaring that he falls within the NDAA court-order exception in order to remove an obstacle that prevents the government from doing what it claims that it has already decided to do in the exercise of its discretion—release him.

*Obama*, 612 F. Supp. 2d 30, 34 (D.D.C. 2009); *cf. Al Ginco v. Obama*, 626 F. Supp. 2d 123 (D.D.C. 2009) (Leon, J.) (granting the writ where the purpose of AUMF detention is not served).

In *Hamdi*, the Supreme Court stated unequivocally that the AUMF does not authorize indefinite or perpetual detention, and "indefinite detention for the purpose of interrogation is not authorized." 542 U.S. at 521. Even in circumstances where detention may be "necessary and appropriate" to prevent a combatant's return to the battlefield, that justification may "unravel" if the practical circumstances of the conflict are entirely unlike those that informed the development of the laws of war. *Id.* at 521; *see also Boumediene v. Bush*, 553 U.S. 723, 771 (2008) (noting, that by 2008, that post-September 11 conflict was already among the longest wars in American history); *id.* at 785 (hostilities may last a generation or more); *id.* at 797-98 (courts may be required to define the outer boundaries of war powers if terrorism continues to pose a threat for years to come). "[A] state of war is not a blank check for the President." *Hamdi*, 542 U.S. at 536.

Here, again, Petitioners continue to be held for no reason other than the government's failure to process paperwork with sufficient time to effectuate their release before President Obama leaves office, leaving them to endure a fate of continued indefinite detention under a new President who has stated that he will cease transferring prisoners from Guantánamo. If indefinite detention for the purpose of interrogation is not authorized, Petitioners' indefinite detention without foreseeable end under these circumstances is surely equally impermissible. In the simplest of terms, absent an order of the Court in the next nine days, Petitioners are likely to continue to languish at Guantánamo long after the president leaves office, if not for the duration of their lifetimes as the prison remains open. Under no circumstances could such arbitrary detention be authorized by the AUMF.

**B.     Petitioners Must Be Released Under the Laws of War**
**Because Their Detention No Longer Serves Its Ostensible Purpose.**

It bears emphasis that the AUMF does not directly authorize detention. As *Hamdi* held, the power to detain may be inferred from the right to use force under "longstanding law-of-war principles." 542 U.S. at 518, 521. The Court further explained that detention is nonpunitive and its sole purpose is "to prevent captured individuals from returning to the field of battle and taking up arms once again." *Id.* at 518; *id.* at 519 (although the AUMF "does not use specific language of detention," detention "to prevent a combatant's return to the battlefield is a fundamental incident of waging war" and thus permitted).[11] The Court concluded that detention is authorized in the "narrow circumstances" where necessary to prevent return to the battlefield, but may last "no longer than active hostilities." *Id.* at 520 (citing Third Geneva Convention art. 118).

The government has long acknowledged that its AUMF detention authority is informed and limited by these law-of-war principles. *See* Resp'ts' Mem. Regarding the Gvt's Detention Authority Relative to Detainees Held at Guantanamo Bay at 1, *In Re Guantanamo Bay Detainee Litigation*, No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009) (dkt. no. 1689) ("Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict.") (citing Geneva Conventions). Under the laws of war, regardless of the nature of the armed conflict, a detainee must be released in circumstances where detention is no longer necessary to prevent his return to the battlefield.

---

[11]     *See also In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) ("The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on he must be removed as completely as practicable from the front, treated humanely and in time exchanged, repatriated or otherwise released.") (quoted in *Hamdi*, 542 U.S. at 518).

In international armed conflicts, fought between nation-states and governed by the Third and Fourth Geneva Conventions,[12] "[t]he grounds for initial or continued detention have been limited to valid needs," and detention is not authorized where it no longer serves an imperative security purpose (in the case of civilians) or where a detainee is "no longer likely to take part in hostilities against the Detaining Power" (in the case of combatants). Jean-Marie Henckaerts & Louise Doswald-Beck, 1 *Customary International Humanitarian Law*, Rule 99, at 344-45 (Int'l Comm. of the Red Cross, Cambridge Univ. Press reprtg. 2009) [hereinafter Henckaerts]. Additional Protocol I to the Geneva Conventions, which the United States has signed (but not ratified) and recognizes as binding customary international law, also specifies that "[a]ny person ... detained or interned for actions related to the armed conflict ... shall be released with the minimum delay possible and in any event as soon as the circumstances justifying the arrest, detention or internment have ceased to exist." Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of International Armed Conflicts art. 75(3), June 8, 1977, 16 I.L.M. 1391, 1410 ("Additional Protocol I").[13]

This limit on detention is even stricter in the context of non-international armed conflicts, which are waged not between nation-states but with armed groups meeting a threshold of violence that exceeds mere "internal disturbances and tensions" such as riots or sporadic violence. Non-international armed conflicts are not subject to the extensive regulations of the

---

[12]     Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 2, Aug. 12, 1949, 6 U.S.T. 3316 ("Third Geneva Convention"); Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 2, Aug. 12, 1949, 6 U.S.T. 3516 ("Fourth Geneva Convention").

[13]     The government concedes that it is legally bound by Article 75 of Additional Protocol I. *See* Fact Sheet: New Actions on Guantánamo and Detainee Policy, The White House, Mar. 7, 2011, available at http://www.whitehouse.gov/the-press-office/2011/03/07/fact-sheet-new-actions-guant-namo-and-detainee-policy.

Third and Fourth Geneva Conventions. Non-international armed conflicts, including the conflict with Al Qaeda,[14] are instead governed by Common Article 3 of the Conventions, which sets forth a minimum baseline of human rights protections, *see Hamdan v. Rumsfeld*, 548 U.S. 557, 628-32 (2006), and Additional Protocol II of the Geneva Conventions. *See* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, art. 1, 16. I.L.M. 1442 ("Additional Protocol II"). In non-international armed conflicts, "the need for a valid reason for the deprivation of liberty concerns both the initial reason for such deprivation and the continuation of such deprivation." Henckaerts, *supra*, Rule 99, at 348; *id.*, Rule 128(C), at 451 ("Persons deprived of their liberty in relation to a non-international armed conflict must be released as soon as the reasons for the deprivation of their liberty cease to exist.").[15]

International human rights law likewise supports the rule that continuing indefinite detention that no longer serves its ostensible purpose is arbitrary and unlawful. *See* International Covenant on Civil and Political Rights art. 9.1, Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (*entered into force* Mar. 23, 1976). As discussed, there can scarcely be a clearer example of arbitrary detention than the present situation, in which Petitioners remain imprisoned not because the detaining authority thinks they should still be held or because their home

---

[14]    The government concedes that the ongoing conflict is governed by Common Article 3. *See* Exec. Order 13,492, § 6, 74 Fed. Reg. 4897, 4899 (Jan. 22, 2009).

[15]    Examples of state practice relating to Customary International Humanitarian Law Rule 128 are available at http://www.icrc.org/customary-ihl/eng/docs/v2_rul_rule128. The government has also acknowledged elsewhere that the indefinite detention of cleared detainees like Petitioner negatively impacts its ability to comply with Common Article 3. *See* ADM Patrick Walsh, USN, Vice Chief of Naval Operations, *Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement* 74 (2009) ("[T]he ability of detainees to understand their future ... will impact the long-term ability to comply with Common Article 3 of the Geneva Conventions."), available at http://goo.gl/dX8LT5.

countries are unable to safely receive and supervise them, but because of delays unrelated to genuine substantive concerns.

### C. The Court Should Apply Constitutional Avoidance Principles and Construe AUMF Detention Authority Narrowly.

As Justice Souter explained in his opinion concurring in the *Hamdi* judgment, when a court is asked to infer detention authority from a wartime resolution such as the AUMF, it must assume that Congress intended to place no greater restraint on liberty than was unmistakably indicated by the language it used, which, given the qualified "necessary and appropriate" force language of the AUMF, necessarily suggests that AUMF detention authority is equally limited. 542 U.S. at 544 (quoting *Ex Parte Endo*, 323 U.S. 283, 300 (1944)). The Court should similarly construe the AUMF narrowly in order to avoid the obvious, serious constitutional problems that a statute permitting Petitioners' indefinite, arbitrary detention would raise. *See Zadvydas v. Davis*, 533 U.S. 678, 689-90 (2001) (construing statute authorizing detention of admitted aliens to contain reasonable time limitation in order to avoid serious constitutional concerns raised by indefinite detention); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (construing statute to limit detention of aliens not formally admitted to the United States to avoid constitutional issues).

Indeed, there can be no serious question that Petitioners' non-criminal detention would violate the Due Process Clause because it would serve no ostensible purpose, and would be indefinite and without foreseeable end. The Supreme Court has repeatedly emphasized that the core purpose of the Due Process Clause is to protect against unlawful detention, regardless of the context. *See, e.g.*, *Zadvydas*, 533 U.S. at 690; *Kansas v. Hendricks*, 521 U.S. 346, 363-64 (1997) (upholding statute requiring civil confinement for sex offenders in part because it provided for immediate release once an individual no longer posed a threat to others); *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (ordering petitioner's release from commitment to mental institution

because there was no longer any evidence of mental illness); *O'Connor v. Donaldson*, 422 U.S.

563, 575 (1975) (even if civil commitment was founded upon a constitutionally adequate basis, it

"[cannot] constitutionally continue after that basis no longer existed"); *Jackson v. Indiana*, 406

U.S. 715, 738 (1972) (state may no longer hold an incompetent criminal defendant in pretrial

civil confinement when probability that defendant might regain capacity to stand trial becomes

remote because "due process requires that the nature and duration of commitment bear some

reasonable relation to the purpose for which the individual is committed."). *See also United

States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention

prior to trial or without trial is the carefully limited exception.").

## III.    Petitioners' Arbitrary Detention Violates Due Process.

If the Court determines it is necessary to decide the constitutional question presented by

Petitioners' detention, it should conclude that the Due Process Clause applies at Guantánamo and

places limits on the duration of Petitioners' detention. The government has determined there is

no longer any need to detain Petitioners. They have not been transferred, and are unlikely to be

transferred absent court order, for reasons having nothing to do with substantive concerns around

their cases or the ability of Algeria and Morocco, respectively, to safely receive and supervise

them. Indeed, more than fourteen years after they were captured and transferred to Guantánamo,

Petitioners face the increasing likelihood that they will be held for the duration of their lives

without charge or trial. Their detention under these circumstances would plainly violate due

process. *Cf. Ali v. Obama*, 736 F.3d 542 (D.C. Cir. 2013) (Edwards, J., concurring) ("It seems

bizarre, to say the least, that [a detainee], who has never been charged with or found guilty of a

criminal act and who has never 'planned, authorized, committed, or aided [any] terrorist attacks,'

is now marked for a life sentence... The troubling question in these detainee cases is whether the

law of the circuit has stretched the meaning of the AUMF ... so far beyond the terms of these statutory authorizations that habeas corpus proceedings ... are functionally useless.")

In *Boumediene v. Bush*, 553 U.S. 723, 770 (2008), the Supreme Court held that the Suspension Clause of the Constitution protects the right of detainees such as Petitioners to challenge the legality of their detention at Guantánamo. In reaching this conclusion, the Court did not state a new constitutional rule but rather made clear that it was reaffirming its long-standing jurisprudence to determine what constitutional standards apply when the government acts with respect to non-citizens within its sphere of foreign operations. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 277 (1990) (Kennedy, J., concurring) ("The proposition is, of course, not that the Constitution 'does not apply' overseas but that there are provisions in the Constitution which do not necessarily apply in all circumstances in every foreign place.") (quoting *Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring)). In *Boumediene*, the Court applied a functional test in determining that the Suspension Clause restrains the Executive's conduct as to Guantánamo detainees like Petitioners, and concluded that it would not be "impractical and anomalous" to grant detainees habeas review because "there are few practical barriers to the running of the writ" at Guantánamo. *See* 553 U.S. at 769-1; *id.* at 784-85 (addressing due process). The Court reasoned that "Guantanamo Bay ... is no transient possession. In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 768-69; *Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring) ("Guantanamo Bay is in every practical respect a United States territory" where our "unchallenged and indefinite control ... has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it."). *See also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is

not confined to the protection of citizens.... [Its] provisions are universal in their application, to all persons within the territorial jurisdiction.").

After *Boumediene*, there can be no serious question that the Due Process Clause also applies at Guantánamo to the extent necessary to limit the duration of Petitioners' detention. Although the Court considered the application of the Suspension Clause at Guantánamo, its functional analysis leads inevitably to recognition of a due process liberty right for Guantánamo detainees, at least to the extent of the right to be relieved of unlawful imprisonment.[16] Indeed, due process and habeas are inextricably intertwined. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525-26 (2004) (plurality opinion) (discussing interaction of habeas and due process); *id.* at 555-57 (Scalia, J., dissenting) (same). To the extent habeas jurisdiction has been recognized at Guantánamo, at least some measure of the Due Process Clause also reaches there because there are plainly no practical barriers that would apply to one provision but not the other. *See id.* at 538 (plurality opinion) ("[A] court that receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself ensure that the minimum requirements of due process are achieved."); *Boumediene,* 553 U.S. at 784-85 (addressing due process). *Cf. Hussain v. Obama*, 134 S. Ct. 1621 (2014) (statement of Justice Breyer respecting denial of certiorari) (Court has not determined whether the Constitution may limit the duration of detention at Guantánamo). That is especially so where, as in this case, a court order granting Petitioners' habeas petitions on the ground that their continuing detention violates due process would achieve what the government

---

[16]    Even prior to the Bill of Rights and addition of the Due Process Clause to the Constitution, a habeas court would have equitable power to grant relief from imprisonment as justice requires. *See* Eric M. Freedman, *Habeas Corpus in Three Dimensions, Dimension III: Habeas Corpus as an Instrument of Checks and Balances*, 8 NE. U. L.J. __ (forthcoming 2016) (manuscript at 144) ("The inherent authority to grant writs of habeas corpus in the absence of a valid suspension is one of the attributes of the 'judicial power' that Article III grants."), *available at* http://ssrn.com/abstract=2647623). *See also supra* Part I.

has already said that it wants to do—repatriate them—notwithstanding its failure to do so because of administrative neglect. This simply is not a case where foreign interests or similar considerations would make it impractical or anomalous to grant relief. *See Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring) ("All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."). If anything, application of the Due Process Clause would help the President achieve his stated goal of closing Guantánamo without further delay.

Nor can the D.C. Circuit's decision in *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) (*Kiyemba I*), be fairly read to preclude the application of due process entirely at Guantánamo. That decision addressed only the narrow question of whether due process authorizes entry into the United States of non-citizens without property or presence in the country. *Id.* at 1026-27. Indeed, there is no other way to read *Kiyemba I* consistently with *Boumediene* or even subsequent panel decisions of the D.C. Circuit. *See Kiyemba v. Obama*, 561 F.3d 509, 514 n.* (D.C. Cir. 2009) (*Kiyemba II*) ("[W]e assume arguendo these alien detainees have the same constitutional rights ... as ... U.S. citizens" detained by the U.S. military in Iraq); *id.* at 518 n.4 (Kavanaugh, J., concurring) ("[A]s explained in the opinion of the Court and in this concurring opinion, the detainees do not prevail in this case even if they are right about the governing legal framework: Even assuming that the Guantanamo detainees ... possess constitutionally based due process rights" they would not prevail); *Kiyemba v. Obama*, 605 F.3d 1046, 1048 (D.C. Cir. 2010) (*Kiyemba III*) ("[P]etitioners never had a constitutional right to be brought to this country and released."); *id.* at 1051 (Rogers, J., concurring) ("Whatever role due process and the Geneva Conventions might play with regard to granting the writ, petitioners cite no authority that due process or the Geneva Conventions confer a right of release in the

continental United States."); *cf. Kiyemba v. Obama*, 131 S. Ct. 1631, 1631-32 (2011) (Breyer, Kennedy, Ginsburg, Sotomayor, JJ., statement respecting the denial of certiorari) (third country's offer to resettle detainees transformed their due process claim seeking entry into the United States, which, should circumstances change in the future, may be raised again before the Court). *See also Aamer v. Obama*, 742 F.3d 1023, 1039 (D.C. Cir. 2014) ("As the government does not press the issue, we shall, for purposes of this case, assume without deciding that the constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantanamo").

It should come as no surprise, therefore, that the government has conceded, and subsequent decisions of the D.C. Circuit have assumed, that the Ex Post Facto Clause of the Constitution, U.S. Const. art. I, § 9, cl. 3, applies at Guantánamo in light of *Boumediene* and notwithstanding *Kiyemba I. See Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc) (noting that government concedes Ex Post Facto Clause applies at Guantánamo); *id.* at 49 (Rogers, J., concurring) ("[*Boumediene*'s] analysis of the extraterritorial reach of the Suspension Clause applies to the Ex Post Facto Clause because the detainees' status and location at Guantanamo Bay are the same, and the government has pointed to no distinguishing 'practical obstacles' to its application."); *id.* at 65 n.3 (Kavanaugh, J., dissenting) ("As the Government concedes, the *Boumediene* analysis leads inexorably to the conclusion that the ex post facto right applies at Guantanamo."). As Judge Kavanaugh explained, "[d]etermining whether the Constitution applies to non-U.S. citizens in U.S. territories requires a 'functional' rather than 'formalistic' analysis of the particular constitutional provision and the particular territory at issue.... In *Boumediene*, the Court determined that Guantanamo was a *de facto* U.S. territory— akin to Puerto Rico, for example, and not foreign territory." *Id.* (distinguishing *Johnson v.*

*Eisentrager*, 339 U.S. 763, 777-81 (1950)); *see also Torres v. Puerto Rico*, 442 U.S. 465, 469 (1979) (Due Process Clause applies in Puerto Rico); *Haitian Ctrs. Council v. McNary*, 969 F.2d 1326, 1343 (2d Cir. 1992) (application of Fifth Amendment at Guantánamo would not be impractical or anomalous), *vacated as moot*, *Sale v. Haitian Ctrs. Council*, 509 U.S. 918 (1993). The Due Process violation here is sufficient to permit the Court to grant either form of relief requested.

## Conclusion

For all of these reasons, the Court should grant this motion and issue an order effectuating Petitioners' release from Guantánamo.

Dated: January 13, 2017

Respectfully submitted,

/s/*Shayana Kadidal*
Shayana D. Kadidal (D.D.C. Bar No. 454248)
Omar Farah (pursuant to LCvR 83.2(g))
J. Wells Dixon (pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6438
kadidal@ccrjustice.org
ofarah@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Petitioner Sufyian Barhoumi*

/s/ Thomas Anthony Durkin
Thomas Anthony Durkin
DURKIN & ROBERTS
2446 N Clark St
Chicago, IL 60614
(312)913-9300
tdurkin@durkinroberts.com

*Attorney for Petitioner Abdullatif Nasser*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— x
                                         :

SUFYIAN BARHOUMI,                :

               Petitioner,     :

           v.           :    Civil Action No. 05-cv-1506 (RMC)

BARACK OBAMA, *et al.*,      :

           Respondents.   :

———————————————————— x

## [PROPOSED] ORDER [#1]

For the reasons set forth in the Petitioner's motion for an order of release or other relief, dated August 12, 2013, the motion is hereby GRANTED as follows:

Applying the plain language of Section 1034(a)(2) of the National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, 129 Stat. 726, 969 (Nov. 25, 2015) ("NDAA"), and construing those provisions in conjunction with 28 U.S.C. § 2243, the Court's equitable, common-law habeas authority recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), and further in order to avoid serious constitutional issues that would otherwise be raised by the Petitioner's continuing indefinite detention, the Court concludes that based on the unique facts and circumstances of this particular case, the Petitioner falls within the provisions of NDAA § 1034(a)(2), and thus shall not be subject to the provisions of NDAA §§ 1034(a)(1) and 1034(b).

The Court hereby DECLARES that this order affects the Petitioner's disposition within the meaning of NDAA § 1034(a)(2).

SO ORDERED, this ___ day of January 2017, at Washington, D.C.

_____
Hon. Rosemary M. Collyer
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

―――――――――――――――――――――――――――――― x
                                           :

SUFYIAN BARHOUMI,               :

                 Petitioner,      :

                   v.           :      Civil Action No. 05-cv-1506 (RMC)

                                             :

BARACK OBAMA, *et al.*,          :

                  Respondents.     :

―――――――――――――――――――――――――――――― x

**[PROPOSED] ORDER [#2]**

This cause coming before the Court on Petitioner's Emergency Motion for Order Effecting Release, the Court hereby orders as follows. The government has conceded that Petitioner's indefinite detention no longer serves any ostensible purpose. Accordingly, construing the Authorization for Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224, 224 (2001), as interpreted by *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and in conjunction with 28 U.S.C. § 2243, the Court's equitable, common-law habeas authority recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), and further in order to avoid serious constitutional issues that would otherwise be raised by Petitioner's continuing indefinite detention, the Court concludes that based on the unique facts and circumstances of this particular case, Petitioner's habeas corpus petition shall be and hereby is GRANTED.

SO ORDERED, this ____ day of January 2017, at Washington, D.C.

 

                                        _____
                                        Hon. Rosemary M. Collyer
                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————— x
                                        :
                                        :
ABDULLATIF NASSER,                      :
                                        :
                    Petitioner,         :
                                        :
            v.                          :     Civil Action No. 05-cv-764 (CKK)
                                        :
BARACK OBAMA, *et al.*,                 :
                                        :
                    Respondents.        :
                                        :
—————————————————————— x

**[PROPOSED] ORDER [#1]**

For the reasons set forth in the Petitioner's motion for an order of release or other relief, dated August 12, 2013, the motion is hereby GRANTED as follows:

Applying the plain language of Section 1034(a)(2) of the National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, 129 Stat. 726, 969 (Nov. 25, 2015) ("NDAA"), and construing those provisions in conjunction with 28 U.S.C. § 2243, the Court's equitable, common-law habeas authority recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), and further in order to avoid serious constitutional issues that would otherwise be raised by the Petitioner's continuing indefinite detention, the Court concludes that based on the unique facts and circumstances of this particular case, the petitioner falls within the provisions of NDAA § 1034(a)(2), and thus shall not be subject to the provisions of NDAA §§ 1034(a)(1) and 1034(b).

The Court hereby DECLARES that this order affects the Petitioner's disposition within the meaning of NDAA § 1034(a)(2).

SO ORDERED, this ___ day of January 2017, at Washington, D.C.


_____
Hon. Colleen Kollar-Kotelly
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————— x
                                                  :
                                                  :
ABDULLATIF NASSER,                                :
                                                  :
                            Petitioner,           :
                                                  :
                  v.                              :      Civil Action No. 05-cv-764 (CKK)
                                                  :
BARACK OBAMA, *et al.*,                           :
                                                  :
                            Respondents.          :
                                                  :
—————————————————————— x

**[PROPOSED] ORDER [#2]**

This cause coming before the Court on Petitioner's Emergency Motion for Order Effecting Release, the Court hereby orders as follows. The government has conceded that Petitioner's indefinite detention no longer serves any ostensible purpose. Accordingly, construing the Authorization for Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224, 224 (2001), as interpreted by *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and in conjunction with 28 U.S.C. § 2243, the Court's equitable, common-law habeas authority recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), and further in order to avoid serious constitutional issues that would otherwise be raised by Petitioner's continuing indefinite detention, the Court concludes that based on the unique facts and circumstances of this particular case, Petitioner's habeas corpus petition shall be and hereby is GRANTED.

SO ORDERED, this ___ day of January 2017, at Washington, D.C.

                                        _____
                                        Hon. Colleen Kollar-Kotelly
                                        United States District Judge