# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————— X
    :
ABDULLATIF NASSER (ISN 244), *et al.,*    :
    :
        Petitioners,    :
    :
        v.    :    Civil Action No. 05-cv-764-CKK
    :    Judge Colleen Kollar-Kotelly
DONALD TRUMP, *et al.,*    :
    :
        Respondents.    :
    :
———————————————————— X

## PETITIONER NASSER'S SUPPLEMENTAL BRIEF MODIFYING HIS POSITION IN THIS ONGOING LITIGATION IN LIGHT OF THE DC COURT OF APPEALS' OPINION IN *ALI v. TRUMP*

Petitioner, **ABDULLATIF NASSER (ISN #244),** by and through his attorneys,

**THOMAS ANTHONY DURKIN, BERNARD E. HARCOURT,** and **MARK MAHER**,

pursuant to the Suspension Clause of Article I, Section 9, Clause 2, of the Constitution of the

United States and the Due Process Clause of the Fifth Amendment, respectfully submits the

following additional argument and authorities in support of his January 11, 2018, joint Motion for

an Order Granting Writ of Habeas Corpus (Dkt. #274) ("Mass Petition"), in light of the decision

of the U.S. Court of Appeals for the District of Columbia in the case of *Ali v. Trump,* No. 18-5297,

959 F.3d 364 (D.C. Cir. 2020). More specifically, Petitioner Nasser supplements his pending

motion to include the allegation explicitly left open by the panel in *Ali v. Trump* that the continued

detention without foreseeable end of a detainee approved for transfer by the Periodic Review Board

("PRB") violates the Suspension Clause because it is totally arbitrary and not tied to the sole

legitimate reason the Government has ever asserted for detention at Guantanamo, namely to prevent detainees from returning to the battlefield pursuant to the laws of war. The arbitrary detention violates the Suspension Clause of Article I, Section 9, Clause 2, the Due Process Clause, or some combination of the two, and requires his immediate release.

In support of this motion, Petitioner, through counsel, shows to the Court the following:

## I.    THE CONUNDRUM & JUDGE HOGAN'S ASTUTE OBSERVATION

Petitioner now specifically asks this Court to address the question left open in *Ali;* that is, the question of "what protections might apply to a detainee whom the Board has determined to be suitable for release, yet who continues to be detained." *Id.* at 371 n.4. This same question, was raised quite astutely by Judge Hogan at the August 2018 oral argument.  His specific comment is worth repeating:

> "The issue is that [Nasser and another detainee] had been cleared for transfer. As such, then, their status is such – it's apparent to me, at least – they're no longer being reviewed by the PRB. So they're in a no-man's land. They're in a Catch-22. They aren't being reviewed by anyone to see if they should be released again…it seems that we have left these individuals out of the process at this point." Transcript of Oral Argument at 31, *Anam et al., v. Trump, et al.*, (D.C. Cir. 2018).

Nasser's continued arbitrary detention, as a detainee the Board has determined to be suitable for release, raises Judge Hogan and the *Ali* panel's open question precisely; as well as the panel's apparent criticism of Ali's counsel not to have raised such a violation. 959 F.3d at 366, 368. As Judge Millet emphasized for the majority in *Ali*, the *Boumediene* Court took a "calibrated or as-applied" approach to considering the constitutional protections due to Guantanamo detainees. *Id.* at 366. Based on an analysis of Nasser's circumstances specifically, as more fully set forth herein, Nasser's continuing arbitrary detention must be said to constitute either: a violation of the

Suspension Clause; a calibrated or as-applied substantive or procedural due process violation; or, if nothing else, a violation of some combination of both the Due Process and Suspension Clauses.[1]

As Justice Kennedy emphasized for the *Boumediene* majority and in concurrence in *Rasul v. Bush*, the length of detention of a Guantanamo detainee is a key factor in the level of scrutiny federal courts must apply in Suspension Clause and habeas corpus challenges: the longer the prisoner is detained, the higher the burden on the Government to justify the detention. In *Boumediene*, Justice Kennedy underscored that immediate intervention was necessary because, despite a statutory exhaustion requirement, the only review afforded by the Detainee Treatment Act of 2005 ("DTA") unacceptably entailed several years of delay. 553 U.S. 723, 794–95 (2008). Moreover, as Justice Kennedy stated in *Rasul*, "as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker." 542 U.S. 466, 488 (2004) (Kennedy, J., concurring). Thus, when considering a Suspension Clause claim specifically, as in *Boumediene*, or the scope of federal habeas corpus jurisdiction more generally, as in *Rasul*, the reviewing court must recognize that the need for judicial intervention increases as the duration of detention increases. In Nasser's case, whatever analysis may have been appropriate when he was first detained in 2002, or even at the filing of the Mass Petition in 2018, current analysis must place greater scrutiny on any purpose—legitimate or otherwise—the Government

---

[1] Counsel are also mindful of the panel opinion in *Al Hela v. Trump*, 772 F.3d 120 (D.C. Cir. 2020), decided after *Ali* on August 28, 2020, holding that the Due Process Clause does not apply to non-citizens detained at Guantanamo. Counsel submit nonetheless that this opinion was wrongly decided, that it should not pertain to a detainee already declared for release by the Board, and that it does not address the contours of the Suspension Clause or the penumbral rights created by the interplay of the Suspension and Due Process Clauses, as advanced more fully herein. Furthermore, it is counsel's understanding that a petition for rehearing *en banc* will be filed on October 26, 2020, in the *Al Hela* case.

provides for Nasser's continued detention. And as the PRB's 2016 recommendation has made clear, there has been no legitimate purpose for Nasser's detention during these past four years.

Nasser's continued detention is, by any definition, arbitrary. President Trump has explicitly indicated that he is unwilling to review any Guantanamo detainee's suitability for transfer, regardless of the individual facts and circumstances. That renders Nasser's continued detention even more illegitimate and arbitrary. The failure to act by any of the relevant executive actors proves this point. Notwithstanding the National Defense Authorization Act for Fiscal Year 2012 ("NDAA") purporting to be a purely discretionary avenue for non-binding review, *see* Pub. L. No. 112-81, § 1023(b)(1), (2)), the PRB unanimously held that Nasser no longer poses a sufficiently grave threat to national security that could outweigh the need to incapacitate him from "returning to the field of battle and taking up arms once again." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518–19 (2004). As discussed below, the arbitrariness and baselessness of his ongoing continued detention triggers greater scrutiny of the Government's stated reasons for continued detention and thus requires greater protection from this Court.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Mass Petition

On January 11, 2018, Petitioner Nasser, alongside ten other Guantanamo detainees, now known euphemistically as the "Forever Detainees," joined in the filing of a Motion for Order Granting Writ of Habeas Corpus. (Dkt. #274). That motion has now become known as the "Mass Petition." Oral argument regarding this mass petition was held on July 11, 2018 before Judge

Hogan.[2] Judge Hogan had not ruled on the motion at the time of the filing of the instant motion, which this Court then set for briefing schedule. (Minute Order, August 7, 2020).

Petitioner Nasser's personal background and the procedural history of his habeas proceedings before this Court is described in detail in the aforementioned motion and incorporated herein by reference. (*See* Dkt. #274, at 4–15). The mass petition highlighted Nasser's proceedings before the Periodic Review Board (PRB), which concluded in its July 2016 Final Determination that Petitioner Nasser's law of war detention was no longer necessary and recommended his transfer to Morocco. (Dkt #274, at 37–38). It also emphasized that "On December 28, 2016, the Department of State and the Department of Defense received an affirmative response from Morocco to State's diplomatic note regarding the security assurances required for Nasser's transfer." (Dkt. #274, at 27). It also described Nasser's 2017 request to this Court for an Emergency Order Effecting Release in the waning days of the Obama administration. This Court denied that motion on January 19, 2017. (Dkt. # 263).

---

[2] Petitioner Nasser was one of eleven (11) detainees to file jointly. The motion was filed in each detainee's pending habeas case. (Dkt. #274). On January 18, 2018, eight of the cases were consolidated following a decision by the Calendar and Case Management Committee, signed by Judge Ellen S. Huvelle. (Minute Entry, January 18, 2018). The consolidated case was referred to Judge Thomas F. Hogan with his consent, for resolution as Case No. 04-cv-1194-TFH. *Id.* Arguments took place on this motion before Judge Hogan on July 11, 2018, and the motion remains pending. Based upon the decision of the U.S. Court of Appeals for the District of Columbia on May 15, 2020 in *Ali v. Trump*, No. 18-5297, 959 F.3d 264 (D.C. Cir. 2020), Petitioner filed a motion: "Unopposed Emergency Motion for Leave to Modify his Position in the Ongoing Litigation in Light of The DC Court of Appeals' Decision in Ali v. Trump, and for Permission to Supplement the Record and File a Supplemental Brief," in recognition that his case differed from those in the mass petition. (Dkt #324). This motion was filed in the cases both before Judge Hogan and this Court. The motion was granted by this Court which set the current briefing schedule. Judge Hogan declined to rule on the motion once this Court did so, indicating that this Court should proceed with the pending motion. (Minute Entry, August 14, 2020).

### B. The Creation of What Judge Hogan Correctly Calls "A Catch-22 No-Man's Land."

Two years after the initial mass petition and over four years since Petitioner Nasser's clearance by the PRB, the Trump administration has worked diligently to fulfill its promise to block any transfers out of Guantanamo and reverse steps taken to close the prison. On January 31, 2018, a few weeks after the mass petition was filed, President Trump signed an Executive Order mandating the continued operation of the prison.[3] The Department of State dismantled the Office of the Special Envoy for Guantanamo Closure (S/GC), which was responsible for negotiating, effectuating, and monitoring transfers of detainees, including of those who had been cleared by the PRB such as Petitioner Nasser.[4] In closing the office, related duties were disposed of or scattered and reassigned to the Bureau of Western Hemisphere affairs, leading to the unraveling of longtime diplomatic assurances even in scenarios where detainees had already been transferred.[5] As a result, the diplomatic agreements that were being secured by the S/GC when President Obama

---

[3] Exec. Order No. 13823, 3 C.F.R. 4831 (2018).

[4] Josh Lederman, *Tillerson to Abolish Most Special Envoys, Including Guantanamo 'Closer,'* MIAMI HERALD (Aug. 29, 2017), https://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article169894127.html. "Today, the office is all but closed, with its responsibilities scattered and diffused without being formally reassigned. The one staff member still on its books has been reassigned elsewhere in the State Department." Benjamin R. Farley, *Maybe Dismantling the GTMO Closure Office Wasn't Such a Good Idea*, JUST SECURITY (Apr. 23, 2018), https://www.justsecurity.org/55109/dismantling-gtmo-closure-office-wasnt-good-idea/. Paul Lewis served as the Department of Defense Special Envoy for Guantanamo Closure from 2013 to 2017. All signs indicate that the position has remained vacant since his departure. GW LAW, *Paul M Lewis*, https://www.law.gwu.edu/paul-m-lewis.

[5] "The last State Department envoy for the closure of Guantanamo, Lee Wolosky, said he had been receiving phone calls from foreign envoys and other concerned people—even though he left government at the close of the Obama administration—because 'they have no one to talk to in the U.S. government.'" Carol Rosenberg, *Trump Closed an Office that Tracked Ex-GTMO Inmates. Now We Don't Know Where Some Went*, IMPACT 2020, (Nov. 13, 2018), https://www.mcclatchydc.com/news/nation-world/national/national-security/guantanamo/article220993900.html.

left office have also since been effectively abandoned by the current administration.[6] In January 2021, the Guantanamo prison will enter its twentieth year.

In short, this procedural deliberateness in dismantling any further review process in the DOD leaves Nasser currently in what Judge Hogan ruefully, but correctly, described at the oral argument as "a Catch-22 No-man's Land" without any process. For an individual like Petitioner Nasser, for whom the PRB has deemed that continued law of war detention is unnecessary, continued detention must be said to be now entirely arbitrary.

### III.   LEGAL ARGUMENT

#### A.   Nasser's Continued, Arbitrary Detention Violates the Suspension Clause.

The Suspension Clause straightforwardly provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. *Boumediene* makes clear that the Suspension Clause guarantees a detainee a "meaningful opportunity to demonstrate that he is being held pursuant to the 'erroneous application or interpretation' of relevant law[]" before a court with "the power to order the conditional release of an individual unlawfully detained[.]" 553 U.S. at 779. Under the Suspension Clause, Congress may not deprive a detainee of access to a habeas court without suspending the writ or repealing the statutory basis for his claim. *Omar v. McHugh*, 646 F.3d 13, 25 (D.C. Cir. 2011) (Griffith, J., concurring). Given that the Suspension Clause "has full effect at

---

[6] Lee Wolosky, former Special Envoy, recently told the New York Times that the current administration has "done nothing to further the deals in place when we left office in regard to the Moroccans and the Algerians and to arrange dispositions for the other three . . . It takes a lot of work to get these things done." Carol Rosenberg, *5 Were Cleared to Leave Guantanamo. Then Trump Was Elected*, N.Y. TIMES (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/guantanamo-prisoners-trump.html?action=click&module=News&pgtype=Homepage.

Guantanamo Bay[,]" *Boumediene*, 553 U.S. at 771, Nasser is "entitled to the privilege of habeas corpus to challenge the legality of [his] detention[,]" *id.*, or an "adequate and effective substitute for habeas corpus[,]" *id.* at 733. As Judge Hogan quite appropriately noticed, Nasser now finds himself in this "Catch-22 No-man's Land" without any meaningful substitute process. And the need for meaningful review and judicial intervention is particularly urgent because of the duration and baselessness of Nasser's continued detention, which renders it arbitrary, in violation of the Suspension Clause's guarantee that detainees like Nasser will be afforded an opportunity to challenge the legality of their detention. *Id.* at 733.

        **1.**    **Nasser's Continued Detention Despite His PRB Recommendation of Transfer is an Arbitrary Violation of the Underlying Law of War for Guantanamo Detention and thus Violates <u>the Suspension Clause.</u>**

Nasser's continued detention no longer has any connection to the underlying purpose of Guantanamo detention, as confirmed by the PRB's recommendation of his transfer. While an executive tribunal found that Nasser no longer posed any immitigable threat to national security, this presidential administration has extended Nasser's detention beyond that which is permissible under the Suspension Clause. This baseless exercise of executive authority renders Nasser's detention so far removed from the underlying law-of-war principle of incapacitating enemy belligerents that it is entirely arbitrary.

The purpose of executive detention at Guantanamo is informed by the law-of-war principle that captured enemy combatants must be prevented from "returning to the field of battle and taking up arms once again." *Hamdi*, 542 U.S. at 518–19 (citations omitted). While the NDAA purports not to "determine the legality of any detainee's law of war detention" through PRB review, such

review is designed to make "discretionary determinations of whether or not a detainee represents a continuing threat to the security of the United States[.]" Pub. L. No. 112-81, § 1023(b)(1). Any continued detention, at least as it relates to once-adjudged enemy combatants detained at Guantanamo, must serve principally to incapacitate enemy belligerents from returning to the battlefield. *See Ali*, 959 F.3d at 370. Here, the PRB determined that "continued law of war detention of [Nasser] is no longer necessary to protect against a continuing significant threat to the security of the United States."[7] In other words, the process initiated at the discretion of the very executive branch that continues to detain Nasser determined that the only legitimate underlying purpose of Nasser's initial detention no longer applies to his continued detention. This is tantamount to detaining Nasser for no reason at all, precisely because the once-legitimate reason for continued detention has now been extinguished by his final PRB review.

*Boumediene* makes clear that the necessary scope of habeas review depends upon the rigor of earlier proceedings. 553 U.S. at 781–82 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In addition, as noted earlier, "as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker." *Rasul*, 542 U.S. at 488 (Kennedy, J., concurring). In light of *Boumediene* and Justice Kennedy's *Rasul* concurrence, taken together, federal courts are empowered to intervene in habeas petitions when the period of detention grows too lengthy without any meaningful opportunity for rigorous habeas review or any countervailing military interest in continued detention. While Nasser has been detained for over eighteen years, the last four of which have been without any meaningful path to release, a

---

[7] Unclassified Summary of Final Determination, *available at* https://www.prs.mil/Portals/60/Documents/ISN244/20160711_U_ISN244_FINAL_DETERMINATION_PUBLIC.pdf.

competent PRB has determined that he no longer meets the underlying requirements for executive detention at Guantanamo. Indeed, neither the military nor the executive could point to any exigencies that require continued detention. The eighteen-year duration of Nasser's detention, the last four of which have been manifestly arbitrary and without any military or law-of-war purpose, has raised the exigency of his release to the point where this Court must issue such remedy.

Given his favorable PRB recommendation, Nasser's continued detention of an exceedingly lengthy duration is an arbitrary exercise of executive authority, in violation of the Suspension Clause. *Hamdi*, 542 U.S. at 518–19; *Boumediene*, 553 U.S. at 794–95 (stating that over two years of delay warranted bypass of the DTA's exhaustion requirement and immediate intervention); *Rasul*, 542 U.S. at 488 (Kennedy, J., concurring).

### 2. The Creation of a Catch-22 No-Man's Land is an Unconstitutional Suspension of the Privilege of Habeas Corpus.

By placing Petitioner Nasser in what Judge Hogan correctly referred to as "a Catch-22 No-Man's Land," the administration has triggered a suspension of Nasser's right to petition for habeas corpus. This effectively denies Nasser any meaningful opportunity to challenge the legality of his continued detention, in violation of the Suspension Clause.

To be sure, while Nasser "may invoke the fundamental procedural protections of habeas corpus" guaranteed by the Suspension Clause, *Boumediene*, 553 U.S. at 798, the D.C. Circuit has indicated that "the determination of what constitutional procedural protections govern the adjudication of habeas corpus petitions from Guantanamo detainees should be analyzed on an issue-by-issue basis[.]" *Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020) (citing *Boumediene*, 533 U.S. 723; *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019)). Indeed, the Supreme Court took this

calibrated approach in *Boumediene*, which tied the constitutional protections afforded to Guantanamo Bay detainees' habeas corpus proceedings to the co-extensive judicial roles of vindicating the constitutional right to the Great Writ and checking abuses of power by the executive branch. *See* 553 U.S. at 798 ("[P]etitioners may invoke the fundamental procedural protections of habeas corpus."); *id.* at 779–83, 793–95.

But even under this calibrated Suspension Clause analysis, petitioner Nasser is entitled to relief. Though the D.C. Circuit has afforded to Guantanamo detainees a calibrated share of the kinds of procedural protections provided to ordinary criminal defendants, this does not in any event and in any way undermine Nasser's claim that he now has no meaningful process and is therefore entitled to relief from this court. The PRB determined that Nasser is entitled to release, but the Government has done nothing with the PRB recommendation. As a result, his rightful relief has not been effectuated. Even if his entitlements are calibrated, Nasser is entitled to *some* review. Right now, he is in no-man's land with no review at all.

*Boumediene* makes abundantly clear that the law must make available to Guantanamo detainees a competent tribunal with the jurisdiction to order their conditional release, though release "need not be the exclusive remedy . . . ." 553 U.S. at 779. Here, Nasser has not been afforded any such access. As the Government argued in its Response to Nasser's Emergency Motion for Release to this Court, the PRB is powerless to order any release of Guantanamo detainees, even conditional release. Respondent's Response to Petitioner's Emergency Motion for Order Effecting Release (Dkt. #259, at 3–6) ("Government Response"). This Court must determine whether the procedures provided to Nasser by the competent authority—here, the "various agency principals" that review PRB recommendations—satisfy *Boumediene*'s guarantee of an adequate

and effective substitute for habeas corpus. 553 U.S. 733; Government Response (Dkt. #259, at 4). In light of the executive administration's stated and proven intention not to release any detainees, that answer is an emphatic "no."

In weighing whether to intervene despite the DTA's exhaustion requirement, the *Boumediene* Court reasoned that the denial of meaningful habeas review for even two years was too long. 553 U.S. at 794–95 ("The first DTA review applications were filed over two years ago, but no decisions on the merits have been issued. While some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody."). Nasser has waited nearly four years—since January 20, 2017—for the current administration to review his case. Nasser's continued detention is without any outweighing legitimate reason. There are no burdens to reviewing Nasser's release that could outweigh the need for immediate intervention. *See id.* ("And there has been no showing that the Executive faces such onerous burdens that it cannot respond to habeas corpus actions."). Upon Nasser's favorable PRB determination, the Moroccan government provided every security assurance necessary to advance his transfer. This administration is simply playing politics in delaying Nasser's clearly established right to liberty— or at least meaningful review of that right. Keeping a campaign promise should not and cannot outweigh the judicial intrusiveness of immediate intervention. *See id.* ("While some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody. The detainees in these cases are entitled to a prompt habeas corpus hearing."). The sheer duration of the procedural limbo that Nasser has endured entails an urgency to a far greater degree than in *Boumediene*, and thus should compel this Court to provide immediate relief.

Because the administration has unconstitutionally suspended the privilege of habeas corpus to which Nasser is entitled, this Court should order the release of Nasser.

### B. Petioner Nasser's Continuing Detention Violates Both Substantive and Procedural Due Process Under The Fifth Amendment.

The Fifth Amendment provides that the federal government shall not deprive any person of "life, liberty, or property, without due process of law." U.S. CONST. amend. V. Nearly two decades ago, Petitioner Nasser was detained without charge at Guantanamo Bay, where he continues to be detained indefinitely. Over four years ago, he was determined to be suitable for release by the PRB and yet has received no further executive review. Considerations of both substantive and procedural due process require that this Court order Petitioner Nasser's release.

### 1. *Al Hela v. Trump* was incorrectly decided: The Due Process Clause applies at Guantanamo Bay.

In *Boumediene*, the Supreme Court established a functional approach to determine which constitutional protections would apply to non-citizens detained without charge at Guantanamo Bay under the power of the AUMF. Any logical reading of *Boumediene* requires that at least some Fifth Amendment Due Process protections apply to non-citizens being detained at Guantanamo Bay.

The recent D.C. Circuit Court of Appeals panel decision in *Al Hela v. Trump*, 772 F.3d. 120 (D.C. Cir. 2020), categorically denying Due Process protections to non-citizens detained at Guantanamo, eschews this functional approach entirely. The majority in *Al Hela* based its holding on two incorrect legal analyses. First, it read the Supreme Court's decision in *Boumediene* to implicate only the Suspension Clause and not the Due Process Clause. *Id.* at 140. Second, it held that the Supreme Court's precedent on the application of the Fifth Amendment

outside U.S. borders demanded a categorical rule denying due process protections to all non-citizens outside the U.S. *Id.* at 139. It is counsel's understanding that a petition for rehearing *en banc* in *Al Hela* will be filed on October 26, 2020.

*Al Hela* is inconsistent with *Boumediene* and with prior D.C. Circuit precent, and it does violence to the Constitution. Furthermore, it cannot be said to apply to someone as uniquely situated as petitioner Nasser. Moreover, it does not in any way detract from Nasser's claims for protection under the Suspension Clause or under the penumbral rights created by the interaction of the Suspension Clause and the Due Process Clause.

### a. The logic of *Boumediene* is driven by due process concerns.

Although *Boumediene* does not explicitly hold that the Fifth Amendment applies at Guantanamo, the Court's concerns for procedural fairness and individual liberty interests are animated by due process concerns. *See* 533 U.S. at 781 ("The idea that the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings accords with our test for procedural adequacy in the due process context."). Even the most strained reading of *Boumediene* necessarily implicates the Fifth Amendment. Assuming for the sake of argument that the *Boumediene* Court viewed the writ of habeas corpus primarily as a vehicle to maintain the judicial branch's role as a check on potentially abusive executive detention, the Great Writ is only relevant to the extent that it can protect the liberty of the people being detained. *Id.* at 797 (judicial authority to consider habeas petitions derives from considerations of "freedom's first principles[,]" primarily "freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers.").

These same due process concerns have animated D.C. District Court decisions on procedural protections in habeas proceedings for Guantanamo detainees in the decade-plus since *Boumediene*. For example, this Court has relied in part on the logic of the Due Process Clause in deciding to suppress coerced statements as evidence used against detainees during habeas petitions. *See Al-Qurashi v. Obama*, 733 F. Supp. 2d 69, 78 n.14 (D.D.C. 2010).

Prior to *Al Hela*, D.C. Circuit precedent recognized that constitutional protections to detainees at Guantanamo seeking habeas may be housed in "the Fifth Amendment's Due Process Clause, the Suspension Clause, both, or elsewhere." *Qassim*, 927 F.3d at 530. Notwithstanding dicta in *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), the D.C. Circuit had consistently assumed arguendo that some due process protections may apply at Guantanamo and instead decided on narrower grounds. *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1039 (D.C. Cir. 2014); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011); *Ali*, 959 F.3d at 369. In the name of "judicial restraint," the majority in *Al Hela* unnecessarily contradicts both the animating logic and functional approach of *Boumediene* and the prevailing philosophy established in D.C. Circuit precedent. *Al Hela*, 772 F.3d at 143 (Randolph, J., concurring).

> **b. Due process rights apply at Guantanamo because it is a territory over which the U.S. maintains de facto sovereignty.**

The *Al Hela* majority's reliance on *Eisentrager v. Johnson*, 339 U.S. 763 (1950), and its progeny is misplaced. *Al Hela*, 772 F.3d at 140. *Eisentrager* involved the constitutional rights of non-citizens being detained by the U.S. in Germany during World War II. *Boumediene* clearly distinguished the unique status of Guantanamo as territory under the "de facto sovereignty" of the United States. *Boumediene*, 533 U.S. at 755. *See also Rasul*, 542 U.S. at 487 (Kennedy, J.,

concurring) ("Guantanamo Bay is in every practical respect a United States territory" where the United States' "unchallenged and indefinite control . . . has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it.").

In doing so, the Court rejected a categorical application of extraterritoriality doctrine to Guantanamo and stressed the need to apply a functional test based on whether applying constitutional protections would be "impracticable and anomalous." *Boumediene*, 533 U.S. at 759. This doctrinal carve-out recognizes the unique circumstances of the detention camp at Guantanamo, which is controlled absolutely by the United States despite being outside its borders and which holds detainees pursuant to a military conflict with no foreseeable endpoint.

More recent Supreme Court precedent has not touched closely at all upon Guantanamo's place within broader extraterritoriality doctrine. While both *USAID v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020), and *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), reference the general idea that non-citizens outside U.S. territory may not necessarily invoke all rights under the Constitution, they both left the doctrinal exceptions for Guantanamo and other potential detention centers under the absolute control of the United States completely intact.

      **c.**    ***Boumediene* gives the D.C. Circuit responsibility to build a jurisprudence that protects the liberty interests of people <u>being detained indefinitely at Guantanamo.</u>**

The Due Process Clause of the Fifth Amendment protects the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Brown v. Mississippi*, 297 U.S. 278, 286 (1936). The detention camp at Guantanamo Bay is an institution under the absolute control of the U.S. government. In its nearly two decades of operation, it has provided a due process-free zone for the United States to operate within.

All people under the absolute control of the U.S. government have a constitutional right to meaningful protection against the deprivation of their liberty that transcends arbitrary territorial distinctions. The Court in *Boumediene* recognized this and left the courts in the D.C. Circuit with the responsibility to develop a functional doctrine to provide judicial review of detention at Guantanamo. In the twelve years since *Boumediene* was decided, judicial review has not protected Nasser from arbitrary detention. The passage of time has only made it clearer that due process protections are necessary to protect against arbitrary executive detentions at Guantanamo, like Nasser's. *Boumediene* gives this Court the responsibility to do justice in light of these circumstances.

        **2.**    **The Due Process Clause protects Petitioner Nasser's interest in freedom from bodily restraint to the same extent that it would protect any U.S. citizen or non-citizen being detained in <u>the sovereign territory of the U.S.</u>**

*Boumediene* provides a clear test for what protections under the Due Process Clause should apply to people being detained at Guantanamo Bay: any protections that would not be "impracticable or anomalous." *Boumediene*, 533 U.S. at 759. There are no practical obstacles preventing this Court from adjudicating the substantive and procedural protections due to detainees at Guantanamo under the Due Process Clause. Just as the Suspension Clause applies at Guantanamo under the "impracticable and anomalous" test, so should the Due Process Clause. *See United States v. Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring) ("All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant.").

In citing *Einsentrager*, the *Al Hela* majority seems to express concern that recognizing some due process protections would require the application of all substantive rights under the Constitution and would ultimately prove to be too great of a burden for the government to shoulder. 772 F.3d at 138. These concerns are unfounded. At issue in this case is not the full gamut of constitutional protections, each of which would require a separate analysis under the "impracticable or anomalous" test. Rather, Petitioner Nasser is solely seeking the freedom from bodily restraint, which is the "most elemental of liberty interests" and has "always been at the core of liberty protected by the Due Process Clause from arbitrary governmental action." *Hamdi*, 542 U.S. at 529 (quoting *Foucha v. Louisiana*, 501 U.S. 71, 80 (1992)). Both substantive and procedural due process consider government interests, but they also protect individuals against unreasonable or arbitrary government deprivations of their liberty.

The United States exercises absolute control over Guantanamo Bay. The fact that it is technically outside of U.S. sovereign territory does not provide any practical barrier to adjudicating due process claims for freedom from bodily restraint that would not otherwise exist for citizens or non-citizens being detained on sovereign U.S. territory. This Court should put a stop to this end run around the Due Process Clause. By recognizing full due process protections relevant to these interests for people being detained at Guantanamo, this Court would ensure that habeas review functions as it should while more explicitly considering the fundamental individual liberty interests on which all of its habeas jurisprudence is at least implicitly based.

### 3. Petitioner Nasser's detention violated the Due Process Clause based on analysis calibrated to his particular circumstances.

Even if this Court declines to decide the full scope of due process protections regarding Guantanamo detainees, it should nonetheless hold that Petitioner Nasser's uniquely arbitrary detention is a violation of the Due Process Clause under a calibrated analysis. The categorical ruling in *Al Hela* is not only incorrect, but cannot constitutionally apply to Nasser's specific circumstances under a calibrated analysis.

The panel in *Ali* emphasized that the *Boumediene* Court took a "calibrated or as-applied" approach to considering the constitutional protections due to Guantanamo detainees. *Ali,* 959 F.3d at 366. Based on a calibrated analysis of Nasser's specific circumstances, Nasser's continuing detention violates substantive due process, procedural due process, and Due Process Clause protections more generally.

### a. Nasser's indefinite detention by animus-driven executive fiat over the past four years is not consistent with the minimum requirements of substantive due process.

Due process places substantive limits on detention authority and requires that noncriminal detention be reasonably tied to its ostensible purpose. *See Clark v. Martinez*, 543 U.S. 371, 384 (2005) (detention only authorized for "a period consistent with the purpose of effectuating removal"). In order to justify ongoing detention, a government actor must be able to articulate how it supports this purpose. *See O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (civil commitment "[cannot] constitutionally continue after [constitutional] basis [for detention] no longer existed").

Over the past four-plus years, the government has provided no explanation for any purpose that Nasser's detention might serve under the laws of war. In fact, the last time Nasser heard from the government was when he was notified that he had been determined to be suitable for transfer to Morocco by the PRB and subsequently notified that he had received the necessary diplomatic assurances for the transfer. Any justification provided for Nasser's initial detention has long since has since "unraveled." *Hamdi*, 542 U.S. at 521. His continued, unjustified detention is arbitrary, and thus violates substantive due process.

### b. The complete lack of process afforded to Nasser over the past four years is not consistent with the minimum requirements of procedural due process.

Procedural due process is the principle that courts must balance government and private interests to determine "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Mathews*, 424 U.S. at 358. The outer contours of what process is due may be determined on a case-by-case basis, *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972), but the *Mathews* factors weigh so heavily in favor of Nasser's interests and against the ostensible interests of the government that there is no reasonable way to interpret Nasser's current detention as satisfying procedural due process.

In cases of non-criminal detention, when fundamental liberty interests are at stake, courts must weigh private interests more heavily in this balancing test as time passes. *See Rasul*, 542 U.S. at 488 (Kennedy, J., concurring). It follows that as detention becomes prolonged, detainees should be provided with an increasingly robust process to challenge their detention. In fact, Nasser has received just the opposite. Having already been determined to be suitable for release by the PRB subject to an unforgiving and constitutionally-suspect evidentiary standard, Nasser is

receiving no review from the government actors who have the power to effectuate his release, despite there being no obvious substantial costs for the government to do so. *Mathews*, 424 U.S. at 347. To quote Judge Hogan, he is "in a Catch-22" and "in a no-man's land." Transcript of Oral Argument at 31, *Anam et al., v. Trump, et al*., (D.C. Cir. 2018). This violates procedural due process.

### c. Petitioner Nasser is being provided with no process at all in the midst of his detention. <u>At the very least, this violates the Due Process Clause.</u>

Even if this Court does not reach the substantive versus procedural distinction, it can simply find that Nasser's arbitrary detention violates the Due Process Clause generally. At stake for Nasser is no less than his most fundamental liberty interest, which is being denied by arbitrary detention. Since Nasser was determined to be suitable for release, the government has provided no indication that his detention advances their ostensible interest under the laws of war. Furthermore, after nearly two decades of detention, he is currently receiving no process at all. *See id.* ("They aren't being reviewed by anyone to see if they should be released again . . . it seems that we have left these individuals out of the process at this point.").

Nasser must be provided *some* level of process to satisfy his due process protections. Even if this Court declines to specify the extent to which Petitioner Nasser's detention violates substantive and/or procedural due process, this Court should at least recognize that the complete lack of process being afforded to him is constitutionally inadequate under the Fifth Amendment.

**C. Petitioner Nasser's Continuing Detention Is Unconstitutional Because It Denies Nasser the Penumbral Rights Guaranteed by the Suspension Clause and Due Process Clause When Considered Together.**

The interplay of the Suspension Clause and the Due Process Clause provide Petitioner Nassser with penumbral rights which are violated by his ongoing, arbitrary detention. The D.C. Circuit panel's recent decision in *Al Hela* addresses only the extent to which the Due Process Clause considered alone applies at Guantanamo, and even as *Al Hela* stands without further review, it does not pertain to Nasser's penumbral rights.

Historically and in practice, the Suspension Clause and the Due Process Clause are inextricably linked. *See Hamdi*, 542 U.S. at 525–26 (discussing the interaction between habeas and due process); *id.* at 555–57 (Scalia, J., dissenting) (same). Even though habeas proceedings are sometimes framed as a judicial check related to separation of powers concerns separate from the individual rights protected by due process, habeas is logically only relevant to the extent that courts are able to protect the rights of individuals from interference by other government branches.

So, it should be no surprise that there is overlap in so many instances between habeas and due process protections. The D.C. Circuit recognized this overlap in *Qassim*, noting that constitutional protections to detainees at Guantanamo seeking habeas may be housed in "the Fifth Amendment's Due Process Clause, the Suspension Clause, both, or elsewhere." 927 F.3d at 530.

This mirrors the Supreme Court's recognition of the complex interplay between constitutional provisions in *Griswold v. Connecticut*, 381 U.S. 479 (1965) In finding a

constitutional right to privacy despite no explicit mention of it in the Constitution, the Supreme Court stated that specific constitutional rights "have penumbras, formed by emanations from those guarantees that help give them life and substance." *Id.* at 484. Similarly, the Due Process Clause and the Suspension Clause interact to create penumbral constitutional rights which both recognize individual liberty and create an avenue by which that liberty can be vindicated through the courts.

To separate these penumbral rights into distinct categories – those protected by the Due Process Clause and those protected by the Suspension Clause – can be a fool's errand. The majority in *Al Hela* attempts to make exactly this categorical distinction, and as a result creates an adjudicatory obstacle where there need be none at all.

This Court need not create the same obstacle for itself. Instead, in light of Petitioner Nasser's ongoing, arbitrary suspension with no foreseeable sign of forthcoming executive review, this Court should simply hold that Nasser's detention violates his penumbral rights under the Due Process Clause and Suspension Clause.

**IV. <u>CONCLUSION</u>**

Wherefore, for these reasons, this Court should grant this motion and order Petitioner Nasser's immediate release.

Dated: October 23, 2020

Respectfully Submitted,


/s/ Thomas Anthony Durkin
Thomas Anthony Durkin (IL Bar No. 697966)
DURKIN & ROBERTS
515 W. Arlington Pl.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com


/s/ Bernard E. Harcourt
Bernard E. Harcourt (NY Bar No. 2356970)
COLUMBIA LAW SCHOOL
435 West 116th Street
New York, NY 10027
(212) 854-1997
beh2139@columbia.edu


/s/ Mark Maher
Mark Maher (NY Bar No. 5347265)
REPRIEVE US
1101 New York Ave. NW
Ste. 1000
Washington, DC 20005
(267) 679-4759
mark.maher@reprieve.org.uk
Admitted only in New York. Practice limited
to federal litigation pursuant to D.C. Court of
Appeals Rule 49(c)(3).


*Attorneys for Petitioner Nasser*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused Petitioner Nasser's Supplemental Brief Modifying His Position in This Ongoing Litigation in Light of the DC Court of Appeals' Opinion in *Ali v. Trump* to be filed with the Court and served on counsel for Respondents via the Court's CM/ECF system.

Respectfully Submitted,

<u>/s/ Thomas Anthony Durkin</u>
Thomas Anthony Durkin (IL Bar No. 697966)
DURKIN & ROBERTS
515 W. Arlington Pl.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com